UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN HARRIS, CRYSTAL CARLSON and GEANA JONES, On Behalf of Themselves and All Other Persons Similarly Situated,<br><br>                            Plaintiffs,<br><br>      -against-<br><br>DESA INDUSTRIES, INC. d/b/a WORLD PATENT MARKETING and SCOTT COOPER,<br><br>                          Defendants. | Case No.:  16-cv-09828 (JSR)<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, Steven Harris, Crystal Carlson and Geana Jones, by their attorneys, Poulos LoPiccolo PC and Nagel Rice, LLP on behalf of themselves and all others similarly situated, make the following allegations on personal knowledge and information and belief:

## I.  FACTUAL BACKGROUND

1.    This class action arises out of a multi-tiered fraudulent scheme to defraud aspiring inventors and entrepreneurs into paying out tens of thousands of dollars to Defendant Desa Industries, Inc., doing business as World Patent Marketing ("WPM"), and its Chief Executive Officer, Scott J. Cooper ("Cooper"), for invention promotion services that WPM never intended to, nor had the capability to, provide.

2.    World Patent Marketing is a company that markets itself as helping inventors patent their ideas and also offers manufacturing and marketing services of inventors' ideas.  WPM advertises that it can help any inventor make their invention idea a reality.  On their website they advertise that by hiring WPM, inventors will be provided everything they need to make their idea a reality that will ultimately make them significant money in the marketplace.  *See* www.worldpatentmarketing.com.  Upon information and belief, WPM has been selling patent

protection and invention promotion services since 2010.

3.       Defendants' slick marketing tactics lure inventors into paying Defendants thousands of dollars.  Unfortunately, despite its promises of professional patent protection and invention promotion services, once Defendants have received payment from its clients, Defendants do next to nothing to obtain a patent for its clients, let alone manufacture and promote inventors' inventions.

4.       On its website WPM holds itself out as "offer[ing] a complete range of invention services.  We provide one-stop-shopping for all your **invention ideas**.  Our vertically integrated approach gives our clients an edge in the innovation marketplace."[1]

5.       Defendants' advertising of its invention services, however, is all false and misleading advertising perpetrated by a sham enterprise.

6.       Defendants even make up false "success stories" of WPM clients making millions of dollars on its website to lure customers into believing that they too can make millions if they hire WPM.  For instance, on June 30, 2015, Defendants advertised the "success story" of Plaintiff Steven Harris.  In an article it posted on its website and sent to all of its clients, Defendants represented that Steven Harris' invention – Teddy's Ballie Bumpers – had obtained a US Utility Patent and began selling his invention online.  The article represents that "sales of the new pet product sky rocket[ed]."  A copy of the article is attached hereto as **Exhibit A**.

7.       However, the claims in the article are completely false.  Steve Harris never obtained a Utility Patent for his invention, despite paying Defendants close to $20,000.  In fact, as described below, on June 24, 2015, six days before Defendants published the Steve Harris "Success Story,"

---

[1] See https://worldpatentmarketing.com/invention-services/.

the US Patent Office reported that Defendants abandoned Steve Harris's provisional patent.[2] He was forced to hire a patent attorney to try to obtain the utility patent WPM never obtained. Unfortunately, Mr. Harris was recently advised that he had very little chance to obtain the Utility Patent for his invention.

8.      The false and misleading "success story" depicted by Defendants was just another way of luring in Plaintiffs and Class Members into paying thousands upon thousands of dollars for advertised services they ultimately would never receive.

**Multi-Tiered Fraudulent Scam**

9.      Defendants' fraudulent patent protection and invention promotion services scam involves multiple steps.   The first step involves the online false and misleading marketing described above that lures potential customers into calling and inquiring about Defendants' invention promotion services.

10.      The customers then purchase a "Global Invention Royalty Analysis" (the "GIRA") - the first tier of the WPM fraudulent scheme.   The price of the GIRA is usually approximately $1,200.00. A copy of the GIRA contract Defendants use with all their customers is attached hereto as **Exhibit B**.

11.      The stated purpose of the GIRA "is to enable the inventor to professionally prepare

---

[2] A provisional patent application is a legal document filed in the United States Patent and Trademark Office (USPTO), that establishes an early filing date, but does not mature into an issued patent unless the applicant files a regular non-provisional patent application within one year.   It is a document that is filed to essentially hold an inventor's place in line while it applies for a non-provisional patent.   A provisional application for patent has a pendency lasting 12 months from the date the provisional application is filed. The 12-month pendency period cannot be extended. Therefore, an applicant who files a provisional application must file a corresponding nonprovisional application for patent (nonprovisional application) during the 12-month pendency period of the provisional application in order to benefit from the earlier filing of the provisional application.      *See* https://www.uspto.gov/patents-getting-started/patent-basics/types-patent-applications/provisional-application-patent

and present their invention so it will get the exposure and support that it needs."

12.     According to the GIRA payment document, it generally includes "a Global Patent Search and Opinion, an Accredited University Marketability Study, a Detailed Product Specification, a Preliminary Patent Drawing, a Market Demographics and Psychographics Report and SIC and NAIC Coding."

13.     What the purchaser of the GIRA ultimately receives is a colorful, polished, legitimate looking bound portfolio, but full of false, deceptive and misleading information solely intended to induce the consumer to continue to the second tier of the WPM scheme.

14.     The information, ratings and analysis of the consumer's invention are manipulated and misrepresented in the GIRA by Cooper and other WPM representatives.

15.     For instance, no matter how un-novel, obvious and useless the consumer's invention is, with absolutely little to no chance of ever being able to obtain a design or utility patent from the United States Patent and Trademark Office (the "USPTO"), the GIRA will always give the invention a positive chance of securing a patent from the USPTO.

16.     For example, each GIRA contains a "Marketability Study" from such purported entities as the "Ivy League Research Lab" or Baylor University which will almost always score the consumer's invention in the "Probably Successful" range.

17.     The intentional misrepresentations in the GIRA stating that the customer's invention will be "Probably Successful" induces the customer to continue on to the second tier of the WPM scheme in order to obtain their goal of obtaining a patent for their invention and ultimately marketing it for sale.

18.     The second tier of the WPM scheme is the consumer being provided with a "World Patent Marketing 10 Point Patent Protection and Publicity Commitment" brochure and contract

(the "PPPC").  A copy of the PPPC Defendants use with all their customers is attached hereto as **Exhibits C1 and C2**.

19.     This "10 Point Patent Protection and Publicity Commitment", which Plaintiffs and Class Members relied on in deciding to enter into the PPPC with Defendants, includes the following services to be provided to WPM customers:

1) Patent Protection

2) Trade Shows (WPM "attends a variety of trade shows in order to cultivate relationships with companies interested in new products")

3) Invention Rendering – "the product designer assigned to the project sculpts the invention or models it in 3-D CAD.  This stage is…a chance for potential investors to see the concept and the benefits of your invention without having to invest to [sic] much or commit to it early on."

4) 3D Virtual Model – "Virtual prototypes can reveal potential clearance issues in moving parts, or bring attention to an undesirable design when viewed from a certain angle.

5) Invention Brochure – "Flyers and brochures are the most common form of advertising and can be pretty cost effective considering how much face-to-face time they get with your potential customers."

6) Media Department and Press Releases – "we send you news to major search engines like Google, Yahoo! and Bing.  We send it to journalists and bloggers.  We deliver it to opt-in news subscribers.  And we host your news release on worldpatentmarketing.com which receives many visitors each month.  World Patent Marketing will reach out to local, regional, national press and prospects on your behalf.  With world patent marketing your news will be sent within the US and around the world.  In addition to getting your information picked up by news outlets, you can also align it to the industries and regions that matter most to your invention."

7) Personal Product Web Page – "We help inventors publicize their product ideas by building a personal product web page for each and every inventor.  We help you succeed online by taking all of the complicated jargon like SEO, PPC, Social and HTML, and turning it into comprehensive marketing strategies stamped with personal service.  Our dedicated team of experts give every Inventor special care and clear reporting of activity to their personal web page."

8) Television Commercial – "An Internet Commercial is a TV commercial that plays on your website instead of on TV."

5

9) International Invention Roundtable – "World Patent Marketing presents the International Invention Roundtable where we bring millionaire businessmen and women together with the next generation of America's Inventors."

10) Personal Licensing Agent – "Through a Brand Representation Licensing Program, World Patent Marketing works with you to enlist manufacturers (Licencees) to produce, market, and sell approved products bearing your brand's name and logo."

20.     Immediately after describing the 10 aforementioned "phases", the WPM 10 Point PPPC then contains an "Exhibit A" which itemizes the following services for the consumer to select at the listed prices:

     (1)     Utility Patent Application - $10,995.00;
     (2)     Design Patent Application - $7,995.00;
     (3)     European Union Patent Application - $18,995.00;
     (4)     Patent Cooperation Treaty Application - $14,995.00;
     (5)     Utility and Design Combination Patent - $14,995.00;
     (6)     Canadian Patent - $14,995.00;
     (7)     Global Patent Application (includes US Utility and Trademark, European Union and PCT) - $34,995.00;
     (8)     PCT & US Patent (Design OR Utility) Combination - $18,995.00;
     (9)     Trademark Application [Add on product – must be combined with a patent application] - $1,495.00;
     (10)     Copyright Application [Add on product – must be combined with a patent application] - $995.00; and
     (11)     Mobile App Development [Add on product – must be combined with a patent application] - $3,995.00.

21.     After reading all the services that will be part of the next step as described in the 10 Point Patent Protection and Publicity Commitment consumers end up purchasing one or more of the above additional services under the PPPC.

22.     WPM consumers are then required to sign the PPPC to consummate their purchase.

23.     After the PPPC is signed by the WPM consumer and the consumer pays WPM thousands more, WPM provides little to no further assistance to the consumer in obtaining his or her patent.

24.     At most, Defendants engage patent agents who don't have the skills or are incapable of obtaining the patent so desired by the WPM consumer.  Indeed, many of the patent agents that have been engaged by WPM are under investigation by the USPTO.

25.     WPM consumers routinely contact Defendants to ascertain the status of their invention patents but are provided with the proverbial run-around.

26.     What's worse is that throughout the fraudulent scheme WPM and Scott Cooper continue to make false claims about the services they provide going so far as to flat out lie about trade shows they attend as exhibitors.  For instance, on March 18, 2015 WPM and Scott Cooper disseminated a press release to its current customers which stated the following:

> World Patent Marketing, the world's fastest growing vertically integrated patented product development company, attended the Graphics of the Americas Trade Show on February 28, 2015 at the Miami Beach Convention Center in Miami Beach, FL…"We are forecasting that the global print market will reach $1 trillion by 2018," said Scott J. Cooper, CEO and Creative Director of World Patent Marketing, "With digital printing and social networking continuing to take a higher share of the market, customers are going to continue to demand the latest technologies.  The profit opportunity in this area is limitless for those that remain on the cutting edge."
>
> ....
>
> Visitors experienced over 400 brands in the Expo and over 50 seminars in English and Spanish. With a 40-year proven track record, GOA is the biggest show of printing inventions in the United States for the Latin American and Southeastern U.S. markets. Over 8,000 graphic communications professionals from over 80 countries attended GOA in 2014. World Patent Marketing took advantage of the opportunity to reach new customers and prospects face-to-face *by exhibiting at GOA*.
>
> ….
>
> The show at the Miami Convention Center was fertile ground for aspiring inventors and entrepreneurs. World Patent Marketing was on hand to help its new and prospective customers navigate all the technical and legal patent issues presented.

(emphasis added)

27.     However, a review of the exhibitors list published for the Graphics of the Americas Trade Show held on February 28, 2015 at the Miami Beach Convention Center in Miami Beach,

FL indicates that World Patent Marketing was not an exhibitor at that trade show. A copy of the exhibitors list and addendum to the exhibitors list (to list those exhibitors that decided to exhibit after the expo guide was printed) from the official expo guide for the Graphics of the Americas Trade Show held on February 28, 2015 is attached hereto as **Exhibit D**.

28.      Eventually, WPM completely abandons the patent process for the consumer and the consumer is left with thousands of dollars of out-of-pocket losses and nothing to show for it.

29.      Some WPM consumers are compelled to expend more monies in engaging professional patent attorneys and/or agents to complete the patent process.

30.      Most, if not all of the time, these endeavors prove futile and the WPM consumers are left with more out-of-pocket losses.

31.      At no point before or during the relationship with any of their customers do Defendants disclose information to their customers relating to WPM's history as an invention promotor as required by the American Inventors Protection Act of 1999, 35 U.S.C. § 297, namely the following:

(1) the total number of inventions evaluated by the invention promoter for commercial potential in the past 5 years, as well as the number of those inventions that received positive evaluations, and the number of those inventions that received negative evaluations;

(2) the total number of customers who have contracted with the invention promoter in the past 5 years, not including customers who have purchased trade show services, research, advertising, or other nonmarketing services from the invention promoter, or who have defaulted in their payment to the invention promoter;

(3) the total number of customers known by the invention promoter to have received a net financial profit as a direct result of the invention promotion services provided by such invention promoter;

(4) the total number of customers known by the invention promoter to have received license agreements for their inventions as a direct result of the invention promotion services provided by such invention promoter; and

(5) the names and addresses of all previous invention promotion companies with which the invention promoter or its officers have collectively or individually been affiliated in the previous 10 years.

## II.    PARTIES

**Plaintiff Steven Harris**

32.    Plaintiff Steven Harris ("Plaintiff") is a resident of the Town of Apex in the County of Wake and State of North Carolina.

33.    Plaintiff Harris invented Teddy's Ballie Bumpers – an inflatable bladder-type device that acts as a bumper for small objects. It allows users to insert the device in the crevice under furniture such as beds, couches, sofas, etc. and then act as a barricade preventing objects such as balls and small toys from rolling underneath the furniture.

34.    In the Spring of 2014, Plaintiff Harris conducted internet searches for a company that may be able to help get his invention patented, manufactured and marketed. He immediately came across the World Patent Marketing website. He was impressed by and relied on all the statements described above. He relied on the statements that World Patent Marketing would provide him patent protection services and also promote and market his invention.

35.    Thus, in or about May of 2014, Plaintiff initially paid WPM $1,295.00 for a "Global Invention Royalty Analysis."

36.    As promised in the GIRA, Defendants would provide "a Global Patent Search and Opinion, an Accredited University Marketability Study, a Detailed Product Specification, a Preliminary Patent Drawing, a Market Demographics and Psychographics Report and SIC and NAIC Coding.

37.    According to the document, "[t]he purpose of the Global Invention Royalty Analysis is to enable the [Plaintiff] to professionally prepare and present [his] invention so it will get the exposure and support that it needs."

38.    The "Global Invention Royalty Analysis" was prepared for Plaintiff on July 02,

2014.  A copy of the Global Invention Royalty Analysis prepared for Plaintiff Harris is attached hereto as **Exhibit E**.

39.     The "Global Invention Royalty Analysis" purportedly contained a "Comprehensive Patent Search Report".

40.     The "Comprehensive Patent Search Report" purported to "uncover[] inventions similar to yours" to "show [Plaintiff] prior art that may be used by the [United States Patent and Trademark Office ("USPTO")] when examining [Plaintiff's] invention" and "whether or not the USPTO will consider [Plaintiff's] invention novel, non-obvious, and useful."

41.     The "Comprehensive Patent Search Report" for Plaintiff's invention identified prior art and products almost identical to Plaintiff's inventions.

42.     Notwithstanding, the "Comprehensive Patent Search Report" concluded that Plaintiff's invention was suitable for both a utility patent and a design patent.

43.     The "Global Invention Royalty Analysis" also purportedly contained a "University Marketability Study" from Baylor University.

44.     The "Baylor University Innovation Evaluation" scored Plaintiff's invention with a 71 which fell into the "Probably Successful" range.

45.     Upon information and belief, all of the above is false and that the "Marketability Study" was not prepared by researchers Baylor University.

46.     Based upon the misleading results of the "Global Invention Royalty Analysis", on July 29, 2014, Plaintiff entered into a Patent Protection and Publicity Commitment with Defendants.  Plaintiff selected the "Patent Cooperation Treaty Application" plan from Exhibit A and paid WPM $17,895.00 for said plan.  A copy of the PPPC is attached hereto as **Exhibit F1 and F2**.

47.     In paying WPM $17,895.00 Harris expected that he would receive the benefit of all ten of the services identified above as included in the 10 Point PPPC

48.     After entering into the Contract, Defendants failed to even deliver step 1 of its 10 Point Patent Protection and Publicity Commitment.

49.     Patent agents employed by WPM, such as Marina Mikhailova, failed to obtain the Patent Cooperation Treaty Application contracted for.  Defendants ultimately abandoned the process of seeking a patent for Plaintiff's "Teddy's Ballie Bumpers" invention and thus failed to perform any of the services it promised as part of its 10 Point Patent Protection and Publicity Commitment.

50.     In fact, Plaintiff would later learn from USPTO representatives that there was a video of essentially the same product as Plaintiff's invention on a Youtube.com video from 2009.

51.     There was no patent to protect by WPM under the Contract because WPM failed to perform under the Contract.

52.     Plaintiff never acquired the patent he sought through WPM or his bargained-for exchange as he was fraudulently mislead into paying WPM tens of thousands of dollars for misleading him into believing his invention was unique when it was not.

53.     Moreover, WPM has fraudulently advertised Plaintiff Harris's invention on WPM's website and on Facebook.com as an alleged "success story" to bait other unsuspecting clients into paying for its bait-and-switch scheme.  In July 2015, WPM posted an article stating Mr. Harris obtained a patent for Teddy's Ballie Bumpers and that "sales of the new pet product sky rocket[ed]."  *See* **Exhibit A**

54.     However, as mentioned above, the claims in the article are completely false.  Steve Harris never obtained a Utility Patent or the Patent Cooperation Treaty for his invention, despite

11

paying Defendants close to $20,000.  In fact, on March 2, 2015 Plaintiff Harris' Patent Cooperation Treaty was denied and on June 24, 2015, 6 days before the Steve Harris "Success Story" was published by Defendants, Plaintiff Harris received notice from the USPTO that Defendants abandoned his provisional patent.

55.     After realizing that Defendants essentially stole thousands of dollars from Mr. Harris using deceptive tactics, Mr. Harris contacted Mr. Cooper.  Mr. Cooper responded with a letter from his attorney threatening Mr. Harris with legal action.

56.     Mr. Harris was then forced to hire a patent attorney to try to obtain the Utility Patent WPM never obtained.  Unfortunately, Mr. Harris was recently advised that he had very little chance to obtain the Utility Patent for his invention.

**Plaintiff Crystal Carlson**

57.     Plaintiff Crystal Carlson ("Carlson") is a resident of the City of Coolidge in the County of Pinal in the State of Arizona.

58.     Plaintiff Carlson invented a baby car seat monitoring system.  The invention is a battery-operated sensor that is placed underneath a baby car seat cover to maintain monitoring of the baby in his or her seat at all times.

59.     She conducted internet searches for a company that may be able to help her get her invention patented, manufactured and marketed.  She immediately came across World Patent Marketing website.  She was impressed by and relied on all the statements described above, including the Steve Harris "success story."  She relied on the statements that World Patent Marketing would provide her patent protection services and also promote and market her invention.

60.     Thus, in or about May of 2015, Carlson initially paid WPM $1,295.00 for a Global

Invention Royalty Analysis.

61.     As promised in the GIRA, Defendants would provide "a Global Patent Search and Opinion, an Accredited University Marketability Study, a Detailed Product Specification, a Preliminary Patent Drawing, a Market Demographics and Psychographics Report and SIC and NAIC Coding."

62.     Carlson's GIRA was prepared for her on July 09, 2015.  A copy of the GIRA is attached hereto as **Exhibit G1 and G2.**

63.     Carlson's GIRA purportedly contained a "Comprehensive Patent Search Report."

64.     The "Comprehensive Patent Search Report" purported to "uncover[] inventions similar to yours" to "show [Plaintiff] prior art that may be used by the [United States Patent and Trademark Office ("USPTO")] when examining [Plaintiff's] invention" and "whether or not the USPTO will consider [Plaintiff's] invention novel, non-obvious, and useful".

65.     The "Comprehensive Patent Search Report" for Carlson's invention identified prior art and products almost identical to Plaintiff's inventions.

66.     Notwithstanding, the "Comprehensive Patent Search Report" concluded that Carlson's invention was suitable for a utility patent.

67.     The GIRA also contained a "Marketability Study" from the "Ivy League Research Lab".

68.     The "Ivy League Research Lab" was purportedly made up of researchers "Attending Harvard/MIT" with "Business/Analyst Experience", "Industrial Research Experience" and "Leadership Experience." *See* **Exhibit G2**.

69.     Upon information and belief, all of the above is false and that the "Marketability Study" was not prepared by researchers "Attending Harvard/MIT".

13

70.     The deceptive "Marketability Study" prepared an "Innovation Evaluation" for Carlson's invention, the purpose of which was to "estimate … the likelihood of this idea, process or product being successful in the marketplace."

71.     Carlson's invention scored a 72, which fell into the "Probably Successful" range.

72.     Based upon the misleading results of the GIRA and reading the false Steve Harris "Success Story" article published by Defendants on June 30, 2015, on August 01, 2015 Carlson agreed to purchase an "Intercontinental Patent (US Comprehensive, PCT, Trademark and Copyright)" protection plan and development services from WPM for $34,995.00.

73.     In paying WPM $34,995.00 for the Intercontinental Patent plan, Carlson expected that she would receive the benefit of all ten of the services identified above as included in the WPM 10 Point PPPC. A copy of the PPPC is attached hereto as **Exhibit H1 and H2**.[3]

74.     Defendants failed to even deliver step 1 of the 10 Point PPPC.

75.     Patent agents employed by WPM, such as Milena Roberts and/or Marina Mikhailova, failed to obtain the Intercontinental Patent Carlson purchased. Defendants ultimately abandoned the process of seeking a patent for Carlson's "Baby Seat Monitoring System" invention and thus failed to perform any of the services it promised as part of the 10 Point PPPC.

76.     There was no patent to protect by WPM under the PPPC because WPM failed to perform under the PPPC that Carlson purchased.

77.     Carlson never acquired the patent she sought through WPM or her bargained-for exchange as she was fraudulently mislead into paying WPM tens of thousands of dollars for misleading her into believing her invention was unique when it was not.

**Plaintiff Geana Jones**

---

[3] Plaintiff Carlson did not initial pages of the PPPC that contained terms she did not agree to.

14

78.     Plaintiff Geana Jones ("Jones") is a resident of the City of Nipomo in the County of San Louis Obispo in the State of California.

79.     Plaintiff Jones invented a silicone patch to cover up tattoos – "SKIN."

80.     She conducted internet searches for a company that may be able to help her get her invention patented, manufactured and marketed.  She immediately came across World Patent Marketing website and was impressed by its 5 star ratings.  She read and relied on all the statements described above.  She relied on the statements that World Patent Marketing would provide her patent protection services and also promote and market her invention.

81.     Thus, in or about July of 2014, Jones initially paid WPM $1,295.00 for a Global Invention Royalty Analysis.

82.     As promised in the GIRA, Defendants would provide "a Global Patent Search and Opinion, an Accredited University Marketability Study, a Detailed Product Specification, a Preliminary Patent Drawing, a Market Demographics and Psychographics Report and SIC and NAIC Coding."

83.     Jones' GIRA was prepared for her on October 20, 2014.  A copy of the GIRA is attached hereto as **Exhibits I 1 and I 2.**

84.     The "Global Invention Royalty Analysis" purportedly contained a "Comprehensive Patent Search Report."

85.     The "Comprehensive Patent Search Report" purported to "uncover[] inventions similar to yours" to "show [Plaintiff] prior art that may be used by the [United States Patent and Trademark Office ("USPTO")] when examining [Plaintiff's] invention" and "whether or not the USPTO will consider [Plaintiff's] invention novel, non-obvious, and useful."

86.     The "Comprehensive Patent Search Report" for Jones' invention identified prior

art and products almost identical to Plaintiff's inventions.

87.   Notwithstanding, the "Comprehensive Patent Search Report" concluded that Plaintiff's invention was suitable for both a utility patent and a design patent.

88.   The "Global Invention Royalty Analysis" also purportedly contained a "University Marketability Study" from Baylor University.

89.   The "Baylor University Innovation Evaluation" scored Plaintiff's invention with a score of 68 which fell into the "Probably Successful" range.

90.   Based upon the misleading results of the "Global Invention Royalty Analysis", on November 5, 2014, Plaintiff entered into a Patent Protection and Publicity Commitment with Defendants.  Plaintiff selected the "PCT and US Patent" plan from Exhibit A and paid WPM $18,895 for said plan.  A copy of the PPPC is attached hereto as **Exhibit J1 and J2**.

91.   In paying WPM $18,895 Jones expected that she would receive the benefit of all ten of the services identified above as included in the 10 Point PPPC.

92.   After entering into the Contract, Defendants failed to even deliver step 1 of its 10 Point Patent Protection and Publicity Commitment.

93.   Not hearing from WPM for a couple weeks after sending in the $18,895 fee, she began attempting to contact WPM via phone calls and emails to get an update on the status of her patent application.  Most of her attempts to contact WPM went unanswered.  The few times that WPM responded, she was given the run around and Robert Gonzalez and "Mary" of the WPM "Legal Department" gave her the impression that her patent application was filed in late December 2014.

94.   However, in March/April 2015 Scott Cooper, for the first time, informed Ms. Jones that he wanted Jones to change the design because it was not patentable as designed.  Ms. Jones

was extremely confused because she had already paid Defendants over $20,000 because they assured her the SKIN design was patentable and that her product would be "probably successful."

95.     And despite promising all the services in the 10 step PPPC, Scott Cooper informed Ms. Jones that he needed her to secure a prototype of a new design.  Scott assured Jones that WPM would pay for any fees associated with developing a new prototype and resubmit the patent application for the new design.  Accordingly, Ms. Jones spent over $70,000 to obtain a new prototype.

96.     Becoming concerned with WPM's continued failure to provide her details about the status of her patent application, on April 22, 2015 Ms. Jones reached out to Scott Cooper again via email requesting an explanation of WPM's process and for client references whom she could contact:

> To make things less stressful for me and you could I get a list of steps from here? What to expect in the next week to come, then weeks to come, then months to come and so on with my invention. I must have this in my hand by Friday April 24, 2015. I can only assume you have something like this already type up and prepared, but if not I really need this to be able to feel comfortable with what you have been talking with me about.
>
> Can I also be provided references? Names and Numbers of at least 3-4 clients that will give me a better idea of how you are operating and what to expect.
>
> Where exactly does this business operate? You have a Florida address and my paperwork states New York.

Mr. Cooper never responded.

97.     In May 2015 Ms. Jones contacted the United States Patent and Trademark Office regarding the status of her application.  The USPTO informed Ms. Jones that the application that was sent in on her behalf in May 2015 was done incorrectly and that they had informed WPM of the same via letter.

98.     Plaintiff then learned that the "Marketability Study" in the GIRA was not prepared by researchers from "Baylor University."   Jones called Baylor University and asked a

representative about the work they do with WPM.  The Baylor University representative Jones spoke to told her he had never heard of World Patent Marketing or Jones' SKIN product.

99.     Plaintiff Jones contacted Mr. Cooper requesting that he reimburse her for the $70,000 she had expended on a new prototype.  Mr. Cooper refused.  Shortly thereafter, expressing her displeasure with the services she had received, Ms. Jones demanded her money back that she had already paid WPM.  Mr. Cooper responded insulting Ms. Jones (calling her "bi-polar") and threatening legal action.  A copy of the email exchange is attached hereto as **Exhibit K**.

100.     Patent agents employed by WPM, such as Marina Mikhailova, failed to obtain the utility patent contracted for.  Defendants ultimately abandoned the process of seeking a patent for Plaintiff's "SKIN" invention and thus failed to perform any of the services it promised as part of its 10 Point Patent Protection and Publicity Commitment.

101.     Ms. Jones was then forced to hire a patent attorney to try to obtain the Utility Patent WPM never obtained for her.  As a result, to date, she has expended an additional $6,350 on fees and costs to correctly file the patent application and obtain a Utility Patent for her SKIN product. At this point, however, the prospects of obtaining a Utility Patent are extremely low.  There are similar products in the market place that WPM should have picked up on before convincing Jones to pay another $18,895 to WPM.

102.     Plaintiff never acquired the Utility Patent she sought through WPM or her bargained-for exchange.  She was fraudulently mislead into paying WPM tens of thousands of dollars and received nothing in return.

**Defendants**

103.     Defendant Desa Industries, Inc. ("Desa") is a corporation organized under the laws of the State of Delaware and maintains its principal place of business located at 228 Park Avenue

South, Suite 35652 in the City of New York, County of New York and State of New York.

104.    Desa does business as World Patent Marketing ("WPM").

105.    WPM's corporate headquarters are located at 1680 Meridian Avenue, Suite 600 in the City of Miami Beach, County of Miami-Dade and State of Florida.

106.    Scott J. Cooper ("Cooper") is the Chief Executive Officer and Creative Director of WPM.

107.    Cooper is believed to be a resident of the State of Florida.

108.    Upon information and belief, Cooper has participated in WPM's fraudulent conduct with the intent to defraud and cause harm to the corporate entity's various victims such as Plaintiffs.

109.    Indeed, Cooper boasts about significant riches he has accumulated as a result of defrauding vulnerable inventors.  For instance, in October 2015 he wrote on his website about his "family yacht trip to the Bahamas" and using his "private jet."  He goes on to brag that WPM is so successful that he was forced to hire world class security.   The articles stated, "[h]e has been forced to take measures to protect the World Patent Marketing Staff. The headquarters offices are heavily protected, with bio-metric scanners for entry, extensive video surveillance, and extensive background checks for all individuals admitted into the building… Cooper has even taken the unprecedented step of hiring a World Patent Marketing Security Force, made up of former Israeli commandos that previously protected the Prime Minister of Israel.  Led by Moti Horenstein, World Patent Marketing executives all over the world have been forced to surround themselves with security forces 24/7 in order to ensure personal safety from outside threats."  A copy of the article is attached hereto as **Exhibit L.**

110.    Cooper brags about his riches on his website to lure in his victims.  But if they dare

request a refund because they were not satisfied with Defendants' services, Cooper uses intimidation tactics in an attempt to deter them from even thinking about legal action. For instance, Plaintiff Carlson and Plaintiff Jones both contacted Mr. Cooper expressing their displeasure with the services they had received. Mr. Cooper responded threatening legal action. Copies of emails from Cooper to Plaintiff Carlson and Plaintiff Jones, are attached hereto as **Exhibit M**.

### III.    JURISDICTION AND VENUE

111.    This court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because at least one class member is of diverse citizenship from the Defendant; there are more than 100 Class Members; and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. This Court also has personal jurisdiction over the parties because Defendant conducts substantial business in New York, has had systematic and continuous contacts with New York, and has agents and representatives that can be found in this State.

112.    Venue is proper in this District under 28 U.S.C. § 1391 because, a substantial part of the events giving rise to the claims occurred and emanated out of this District, and Defendant's conduct has injured Class and Subclass Members residing in this District. Accordingly, this Court has jurisdiction over this action and venue is proper in this Judicial District.

113.    Defendants are amenable to personal jurisdiction in New York. A substantial portion of the wrongdoing alleged in the Complaint took place in New York and Defendants conduct business within the state sufficient to be considered present in New York.

### IV.    CLASS ACTION ALLEGATIONS

114.    Plaintiffs bring this action on behalf of themselves and all other persons similarly situated, pursuant to Rule 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

20

115.   Plaintiffs seek certification of a Class and Subclasses, initially defined as follows:

**Class (the "Nationwide Class"):**

All persons or entities in the United States who are current or former customers of DESA Industries, Inc. d/b/a World Patent Marketing.

116.   Alternatively, Plaintiff proposes the following state specific subclasses:

**Subclass 1 (the "Arizona Class"):**
All persons or entities in Arizona who are current or former customers of DESA Industries, Inc. d/b/a World Patent Marketing.

**Subclass 2 (the "North Carolina Class")**
All persons or entities in North Carolina who are current or former customers of DESA Industries, Inc. d/b/a World Patent Marketing.

**Subclass 3 (the "California Class")**
All persons or entities in California who are current or former customers of DESA Industries, Inc. d/b/a World Patent Marketing.

117.   Specifically excluded from the Class and Subclass are:  (a) Defendant and any entity in which Defendant has a controlling interest, (b) any of Defendant's officers, directors, employees, agents, representatives, and their family members, and officers, directors, employees, agents, representatives, and their family members of any entity in which Defendants have a controlling interest, and (c) any judicial officers involved in this matter.

118.   **Numerosity/Impracticability of Joinder**: The members of the Class and Subclass are so numerous that joinder of all members would be impracticable.  The proposed Class and Subclass includes thousands of members.  Upon information and belief, Defendants have sold its services to over 1,400 customers.  The Class and Subclasses are composed of an easily ascertainable, self-identifying set of individuals and entities.  The precise number of Class and Subclass Members can be ascertained by reviewing documents in Defendants' possession, custody, and control.

119.   Plaintiffs are members of the Class and Subclasses.

120.   **Commonality and Predominance**: There are common questions of law and fact that predominate over any questions affecting only individual members of the Class and Subclass. These common legal and factual questions, include, but are not limited to, the following:

    a.   Whether Defendant violated the AIPA by failing to make proper disclosures to its customers under the AIPA or by misrepresenting or omitting a material fact to its customers;

    b.   Whether Defendants breached their contracts with Plaintiff and the Class Members;

    c.   Whether Defendant violated New York's General Business Law §§ 349 and 350;

    d.   Whether Defendants violated Arizona's Consumer Fraud Act, A.R.S. § 44-1521, *et seq*

    e.   Whether Defendants violated North Carolina's Unfair and Deceptive Trade Practices Act N.C.G.S.A. §75-1.1 et seq.

    f.   Whether Defendants violated California's consumer protection laws, including Cal. Bus. & Prof. Code § 17200 *et seq.*, the Consumer Legal Remedies Act, Civil Code § 1750 *et seq.*, and Bus. and Prof. Code § 17500, *et seq.* ;

    g.   To the extent other State laws prohibiting consumer deception are applicable, did Defendants violate the respective laws of those States;

    h.   Whether Defendants were unjustly enriched by their deceptive practices; and

    i.   As a result of Defendants' actions and failures to act, are the Class and Subclass Members entitled to compensatory, restitutionary, statutory or other damages against Defendants

121.   **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Class and Subclass. Plaintiffs and all Class and Subclass Members have been injured by the same wrongful practices by Defendants. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the Class and Subclass Members and are based on the same legal and remedial theories. Indeed, Plaintiffs and all members of the Class and Subclasses were subject to the same misrepresentations and omissions and deceptive conduct by Defendants which induced them to pay thousands and thousands of dollars over to Defendants which ultimately

ended up with Class and Subclass members not receiving what they were promised.

122.    **Adequacy**:  Plaintiffs will fully and adequately assert and protect the interests of the Class and Subclass Members, and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys have any interests that are contrary to or conflicting with the Class and Subclass Members.

123.    **Superiority**:  A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all Class and Subclass Members is not economically feasible and is procedurally impracticable. While the aggregate damages sustained by the Class and Subclass Members are in the millions of dollars, and are no less than five million dollars upon information and belief, the individual damages incurred by each Class and Subclass Member resulting from WPM and Scott Cooper's wrongful conduct are too small to warrant the expense of individual suits. The likelihood of individual Class and Subclass Members prosecuting their own separate claims is remote, and, even if every Class and Subclass Member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Class and Subclass Members do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and to the court system because of multiple trials of the same factual and legal issues. Plaintiffs know of no unusual difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

124.    In addition, Defendants have acted or refused to act on grounds generally applicable to the Class and Subclass Members and, as such, final injunctive relief or

corresponding declaratory relief with regard to the members of the Class and Subclass as a whole is appropriate.

## V.     TOLLING

**Discovery Rule**

125.    The causes of action alleged herein accrued upon discovery of the misrepresentation by Defendants.  Because Defendants continued to engage in fraudulent and deceptive conduct even after receiving payment from its customers, it concealed the reality that Defendants in fact had no intention of providing any of the services they promised and that Defendants' whole operation is a fraudulent scheme to extract thousands of dollars from each of its customers.  Because Defendants to the date of the Complaint actively concealed its fraudulent scheme from Plaintiffs and members of the Class and Subclass, they did not discover and could not have discovered the fraudulent scheme they were subject to until they ultimately are notified that their invention is not patentable or was abandoned by Defendants, despite Defendants' misrepresentations and omission.

**Fraudulent Concealment**

126.    Any applicable statutes of limitation have been tolled by Defendants' knowing and active and ongoing concealment and denial of the facts as alleged herein.  Plaintiffs and the Class and Subclasses have been kept ignorant by Defendants' of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.  Plaintiffs and members of the Class and Subclass could not reasonably have discovered the true nature of Defendants' fraudulent scheme.

**Estoppel**

127.    Defendants' knowingly, affirmatively, and actively concealed that they had no

intention of providing any of the services they promised in marketing material to induce Plaintiff and Class and Subclass members to pay thousands of dollars to Defendants. Plaintiffs reasonably relied upon Defendants' knowing, affirmative, and/or active and ongoing concealment. Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

## VI.   CLAIMS FOR RELIEF
### FIRST COUNT (On Behalf of Plaintiffs, Class and Subclass Members)
### (Violation of the American Inventors Protection Act of 1999, 35 U.S.C. § 297)

128.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

129.   WPM and Scott Cooper are "invention promoters" as defined by the American Inventors Protection Act of 1999, 35 U.S.C. § 297 ("AIPA").

130.   The Global Invention Royalty Analysis and Patent Protection and Publicity Commitment are "contract[s] for invention promotion services" as defined by AIPA.

131.   Plaintiffs and Class and Subclass Members are "customers" as defined by AIPA.

132.   Defendants contracted with Plaintiffs and Class and Subclass Members to provide Plaintiffs with "invention promotion services" as defined by AIPA by and through the Global Invention Royalty Analysis and Patent Protection and Publicity Commitment and all actions taken by WPM and Cooper thereafter on behalf of Plaintiffs.

133.   AIPA required Defendants to disclose the following five (5) enumerated categories of information to Plaintiffs and Class Members "prior to entering into a contract for invention promotion services:"

> (1) the total number of inventions evaluated by the invention promoter for commercial potential in the past 5 years, as well as the number of those inventions that received positive evaluations, and the number of those inventions that received negative evaluations;

(2) the total number of customers who have contracted with the invention promoter in the past 5 years, not including customers who have purchased trade show services, research, advertising, or other nonmarketing services from the invention promoter, or who have defaulted in their payment to the invention promoter;

(3) the total number of customers known by the invention promoter to have received a net financial profit as a direct result of the invention promotion services provided by such invention promoter;

(4) the total number of customers known by the invention promoter to have received license agreements for their inventions as a direct result of the invention promotion services provided by such invention promoter; and

(5) the names and addresses of all previous invention promotion companies with which the invention promoter or its officers have collectively or individually been affiliated in the previous 10 years.

35 U.S.C. § 297(a)(1)-(5)

134.    Defendants violated AIPA by not providing the proper disclosures to Plaintiffs prior to entering in the GIRA and PPPC with Plaintiffs.  Further, the statement by Defendants in the Global Invention Royalty Analysis that "[o]ver the past five years, World Patent Marketing has not contracted with any customers or evaluated any inventions for commercial potential" was false and misleading.

135.    AIPA further provides:

Any customer who enters into a contract with an invention promoter and who is found by a court to have been injured by any material false or fraudulent statement or representation, or any omission of material fact, by that invention promoter (or any agent, employee, director, officer, partner, or independent contractor of such invention promoter), or by the failure of that invention promoter to disclose such information as required under subsection (a), may recover in a civil action against the invention promoter (or the officers, directors, or partners of such invention promoter), in addition to reasonable costs and attorneys' fees—

(A) the amount of actual damages incurred by the customer; or

(B) at the election of the customer at any time before final judgment is rendered, statutory damages in a sum of not more than $5,000, as the court considers just.

136.    Under circumstances where "the court finds ... that the invention promoter

26

intentionally misrepresented or omitted a material fact to such customer, or willfully failed to disclose such information as required under subsection (a), with the purpose of deceiving that customer, the court may increase damages to not more than three times the amount awarded" under AIPA.

137. As more particularly described above in this Complaint, Defendants violated Paragraphs (b)(1) and (b)(2) of AIPA and are therefore liable for all damages proscribed by AIPA.

138. By reason of the foregoing, Defendants are liable to Plaintiffs and the Class individually, jointly, severally, or in the alternative by the Court, for actual damages sustained and statutory trebling of those damages, together with punitive damages, statutory attorneys' fees, costs of suit and interest.

### SECOND COUNT (On Behalf of Plaintiffs, Class and Subclass Members) (Violations of New York's General Business Law, §§ 349 and 350)

139. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

140. Plaintiffs assert that because WPM is a New York corporation with its headquarters located in New York, and because the contracts that are the subject of this lawsuit state that New York law shall govern, choice of law rules in this Circuit support application of the New York General Business Law ("GBL") §§ 349 and 350 to the claims of class members nationwide.

141. Plaintiffs bring this cause of action on behalf of themselves and on behalf of members of the Class against Defendants. Plaintiffs bring this action pursuant to New York General Business Law ("GBL") §§ 349 and 350.

142. New York's Deceptive Practices Act (the "NYDPA") provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

143.    The NYDPA also provides "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

144.    The NYDPA provides a private cause of action to persons such as Plaintiff that have been injured as a result of deceptive acts or practices and provides for recovery of actual damages and statutory attorneys' fees.

145.    As more particularly described in this Complaint above, Defendants misrepresented and omitted material information and engaged in deceptive acts or practices in violation of the NYDCPA and is therefore liable for all damages proscribed by the NYDCPA to Plaintiff and the Class.

146.    WPM also engaged in "advertising" of its purported services under the "Global Invention Royalty Analysis" and the "Patent Protection and Publicity Commitment" which were misleading in material respects to Plaintiff and the Class.

147.    For instance, Defendants knew and intended for consumers to rely on its material misrepresentations and omissions with regard to the invention promotion services it would provide to Plaintiffs and the Class members when in reality Defendants had no intention and no ability to provide such services.

148.    Moreover, Defendants' material omissions of the required AIPA disclosures was a deceptive practice and a violation of the NYDCPA.

149.    Plaintiffs and other Class Members relied on Defendants' fraudulent misrepresentations and omissions in making the decision to pay for the Defendants' alleged professional services. As a result of Defendants' misrepresentations, Plaintiff Carlson agreed to pay Defendants a total of $36,290.00, Plaintiff Harris agreed to pay Defendants $19,190.00 and Plaintiff Jones agreed to pay Defendants $20,190.00 relying on the misrepresentations and

omissions detailed in this Complaint that Defendants would provide professional patent services and also manufacture and market their inventions once they received their respective patents.

150.    Defendants have exclusive knowledge of its intention to not provide such services promised and the fact that it could not provide the services.  Plaintiffs and/or Class Members could not, in the exercise of reasonable diligence, have discovered this information independently prior to paying for Defendants' services up front.

151.    Defendants'   misrepresentations   and   concealment   of   facts   constitute unconscionable commercial practices, deception, fraud, false pretenses, misrepresentation, and/or knowing concealment, suppression, or omission in connection with the sale and advertisement of the invention promotion services, in violation of New York GBL §§ 349 and 350.

152.    Defendants' conduct was objectively deceptive and had the capacity to deceive reasonable consumers under the circumstances.   This fact would influence a reasonable consumer's choice of action during the purchase of the invention promotion services.

153.    Had Defendants disclosed all material information as required under the AIPA and did not make the material misrepresentations described in this Complaint, Plaintiffs and other members of the Class would not have purchased the services from Defendants.

154.    Defendants' conduct had an impact on the public interest because the acts were part of a generalized course of conduct affecting numerous consumers.

155.    As a direct and proximate result of Defendants' violations of GBL §§ 349 and 350, Plaintiffs and Class Members have suffered damages, for which they are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

**THIRD COUNT (On Behalf of Plaintiffs and Subclass Members)**
**(Arizona's Consumer Fraud Act, <u>A.R.S.</u> § 44-1521, *et seq*.)**

156.    Plaintiffs incorporate by reference the allegations contained in the preceding

paragraphs of this Complaint.

157.    As the choice of law question cannot be conclusively addressed at this point in the litigation, Plaintiffs state this alternative cause of action on behalf of a subclass of Arizona State residents, if it is later determined by the Court that the choice of law rules require the application of State law based on Plaintiff's residence, and not those of New York.

158.    Arizona's Consumer Fraud Act, A.R.S. § 44-1521, *et seq*. (the "ACFA"), provides that "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."

159.    Plaintiff is and was at all times a resident of the State of Arizona.

160.    "'Merchandise' means any objects, wares, goods, commodities, intangibles, real estate, or services." A.R.S. § 44-1521(5).

161.    Defendants provide patent and invention promotion services and thus the services offered are subject to Arizona's Consumer Fraud Act.

162.     The ACFA provides an injured consumer with an implied private cause of action against a violator of the act, including, but not limited to, an award of punitive damages.

163.    The elements of a private cause of action under the ACFA are a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and the hearer's consequent and proximate injury.

164.    Defendants violated the ACFA by making false promises and misrepresentations

30

with the sale and advertisement of the GIRA and the PPPC.

165.     Moreover, Defendants' material omissions of the required AIPA disclosures was a deceptive practice and a violation of the ACFA.

166.     Had Defendants disclosed all material information as required under the AIPA and did not make the material misrepresentations described in this Complaint, Plaintiffs and other members of the Class would not have purchased the services from Defendants.

167.     As a direct and proximate result of Defendants' violations of ACFA, Plaintiffs and Class Members have suffered damages, for which they are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

### FOURTH COUNT (On Behalf of Plaintiffs, Class and Subclass Members) (Violation of North Carolina's Unfair and Deceptive Trade Practices Act N.C.G.S.A. § 75-1.1, *et seq.*)

168.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

169.     As the choice of law question cannot be conclusively addressed at this point in the litigation, Plaintiffs state this alternative cause of action on behalf of a subclass of North Carolina State residents, if it is later determined by the Court that the choice of law rules require the application of State law based on Plaintiff's residence, and not those of New York.

170.     North Carolina's Unfair and Deceptive Trade Practices Act, N.C.G.S.A. § 75-1.1, *et seq.* (the "NCUTPA"), declares "unfair or deceptive acts or practices in or affecting commerce" as "unlawful."

171.     Plaintiff Harris is a resident of North Carolina and his dealings with WPM and Cooper affected commerce.

172.     The NCUTPA provides a private cause of action to persons such as Plaintiff that

have been injured as a result of deceptive acts or practices and provides for recovery of actual damages, trebling of those actual damages and statutory attorneys' fees.

173.     As more particularly described in this Complaint above, Defendants committed deceptive acts or practices in violation of the NCUTPA by making false promises and misrepresentations with the sale and advertisement of the GIRA and the PPPC and is therefore liable for all damages proscribed by the NCUTPA to Plaintiff Harris and the Subclass Members.

174.     Moreover, Defendants' material omissions of the required AIPA disclosures was a deceptive practice and a violation of the NCUTPA.

175.     Plaintiff suffered actual damages as a result of the Defendants' violation of the NCUTPA.

176.     Had Defendants disclosed all material information as required under the AIPA and did not make the material misrepresentations described in this Complaint, Plaintiffs and other members of the Class and Subclass would not have purchased the services from Defendants.

177.     As a direct and proximate result of Defendants' violations of NCUTPA, Plaintiffs and Subclass Members have suffered damages, for which they are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

**FIFTH COUNT (On Behalf of Plaintiff Jones and the California Subclass)**
**(Violations of Cal. Bus. & Prof. Code § 17200 *et seq.*)**

178.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

179.     Defendants have engaged in unfair, unlawful and fraudulent business acts or practices as set forth above.

180.     Plaintiff brings this cause of action on behalf of herself and the California Class, pursuant to California Business and Professions Code, §17200, *et seq.*

181.    Defendant's conduct constitutes unfair business acts and/or practices because Defendants' practices have caused and are likely to cause substantial injury to Plaintiff which injury is not reasonably avoidable by Plaintiff in light of Defendants' multistep fraudulent scheme to lure thousands of dollars from each of its customers with no intention, and no ability, of ever performing the patent protection and invention promotion services they advertised and promised.  Such conduct is ongoing and continues to this date.

182.    The injury to consumers is substantial, particularly because the Defendants engaged in a multistep fraudulent scheme to lure thousands of dollars from each of its customers with no intention, and no ability, of ever performing the patent protection and invention promotion services they advertised and promised.  Further they failed to make disclosures regarding their business practices prior to engaging in any contract with their customers as required by federal law.  Plaintiff and Subclass members paid thousands of dollars for services that they would not otherwise have paid to Defendants.

183.    The injury to consumers is not outweighed by any countervailing benefits to consumers or competition.   Indeed, Defendants provided no benefit to the Plaintiff and subclass members whatsoever.   Plaintiffs and subclass members received nothing for the thousands of dollars paid to Defendants.

184.    The injury to consumers is not an injury that consumers themselves could reasonably have avoided because consumers did not know about Defendants' fraudulent scheme. Defendants have a professional looking website and even manipulates Google ratings and reviews such that complaints or bad reviews are not made public.

185.    Defendants' acts and practices of selling its patent protection and invention promotion services with no intention, and no ability, of ever performing the patent protection and

33

invention promotion services they advertised and promised offends an established public policy and are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

186.    It is unethical and oppressive to engage in a multistep fraudulent scheme to lure thousands of dollars from each of its customers with no intention, and no ability, of ever performing the patent protection and invention promotion services they advertised and promised. Further, as alleged in detail above, Defendants intentionally failed to make disclosures regarding their business practices prior to engaging in any contract with their customers as required by federal law, a law that was passed to protect inventors from this very fraudulent scheme, which renders Defendants' conduct particularly immoral, unethical, oppressive and unscrupulous.

187.    Defendants' conduct also offends established public policies concerning consumer protection and class action litigation. The California Supreme Court has found that "[p]rotection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society." *Vasquez v. Super. Ct.,* 4 Cal. 3d 800, 808 (1971). Moreover, the public policy at the very core of the class action mechanism is to overcome the problem that relatively small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively small potential recoveries into something worth someone's time and labor. *Amchem Prods. v. Windsor,* 521 U.S. 591, 617 (1997) (quoting *Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344 (7th Cir. 1997).

188.    Defendants' acts, practices and omissions threaten an incipient violation of antitrust laws and/or consumer protection statutes, or violate the policy and spirit of one of those laws because the effect of the acts and practices are comparable to or the same as a violation of the law or otherwise significantly threaten or harm competition. Defendants' acts and practices

harm competition by luring consumers to purchase its patent protection and invention promotion services with no intention, and no ability, of ever performing the patent protection and invention promotion services they advertised and promised. The free market requires the free flow of information to run effectively. Defendants' significant misrepresentations and its failure to disclose information required under the American Inventors Protection Act, impedes the free market.

189.   Defendants' acts and practices are unlawful because they violate the Consumer Legal Remedies Act, Civil Code § 1750 *et seq.*, and Bus. and Prof. Code § 17500, *et seq.*

> i.   Defendants violate Cal. Bus. Prof. Code § 17500 as alleged throughout this Complaint and incorporated hereto by reference.
>
> ii.   Defendants violate CLRA Cal Civ. §§ 1750 *et seq.* as alleged throughout this Complaint and the Third cause of action, incorporated hereto by reference.

190.   Defendants' acts and practices are fraudulent in that they have deceived and/or are "likely to deceive" Plaintiff and members of the consuming public. Defendants' engaged in a multistep fraudulent scheme to lure thousands of dollars from each of its customers with no intention, and no ability, of ever performing the patent protection and invention promotion services they advertised and promised.

191.   Plaintiff and Subclass members relied on Defendants' unfair, unlawful, and fraudulent business acts and practices to their detriment in that they would not have purchased Defendants' services had they known that Defendants had no intention or ability to perform the services Defendants promised. As alleged herein, Plaintiffs relied on Defendants' material misrepresentations and omissions and would not have paid for the services had Defendants

disclosed that multistep fraudulent scheme to lure thousands of dollars from each of its customers with no intention, and no ability, of ever performing the patent protection and invention promotion services they advertised and promised.

192.     Plaintiff and subclass members have suffered injury in fact and have lost money as a result of Defendants' unfair competition in that they have paid for a service and received nothing in return as a result of Defendants unlawful and fraudulent acts and omissions. As a direct and proximate result of Defendant's violations of violations of Cal. Bus. & Prof. Code § 17200 *et seq.*, Plaintiff and Subclass Members have suffered damages, for which they are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

### SIXTH COUNT (On Behalf of Plaintiff Jones and the California Subclass) (Violations of Cal. Bus. & Prof. Code § 17500 *et seq*)

193.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

194.     Plaintiff brings this cause of action on behalf of herself and the subclass pursuant to California Business and Professions Code, § 17500 *et seq*

195.     Defendants are "persons" as defined by Cal Bus and Prof Code § 17506.

196.     Defendants engaged in a multistep fraudulent scheme to lure thousands of dollars from each of its customers with no intention, and no ability, of ever performing the patent protection and invention promotion services they advertised and promised. Further they failed to make disclosures regarding their business practices prior to engaging in any contract with their customers as required by federal law.

197.     Defendants' false advertising through misrepresentations and omissions of material fact has deceived and is "likely to deceive" Plaintiff and Subclass members.

36

198.    Plaintiff and Class members relied upon Defendants' false advertising to their detriment in that they would not have paid for the services had Defendants disclosed that multistep fraudulent scheme to lure thousands of dollars from each of its customers with no intention, and no ability, of ever performing the patent protection and invention promotion services they advertised and promised.

199.    Defendants' false advertising and omissions directly and proximately caused Plaintiffs and Subclass members' injuries in that but for Defendants' multistep fraudulent scheme to lure thousands of dollars from each of its customers with no intention, and no ability, of ever performing the patent protection and invention promotion services they advertised and promised, and their failure to make disclosures regarding their business practices prior to engaging in any contract with their customers as required by federal law, Plaintiff and subclass members would not have paid WPM for patent protection and invention promotion services.

200.    Plaintiff and Subclass members have suffered injury in fact and have lost money as a result of Defendants' false advertising and omissions in that they have paid for a service and received nothing in return as a result of Defendants unlawful and fraudulent acts and omissions. As a direct and proximate result of Defendants' violations of violations of Cal. Bus. & Prof. Code § 17500 *et seq.*, Plaintiff and Subclass Members have suffered damages, for which they are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

### SEVENTH COUNT (On Behalf of Plaintiff Jones and the California Subclass) (Violations of the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*)

201.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

202.     Plaintiff seeks to enjoin Defendant's violation of the California Consumers Legal Remedies Act ("CLRA"), California Civil Code §§ 1750 *et seq.,* as well as damages resulting from Defendants' violations of the CLRA.

203.     At all times relevant hereto, Plaintiff and Class members were "consumer[s]" as that term is defined in Civ. Code § 1761(d).

204.     At all times relevant hereto, Defendant constituted a "person" as that term is defined in Civ. Code § 1761(c).

205.     At all times relevant hereto, Defendants provided "services" to Plaintiffs within the meaning of Civil Code § 1761(b).

206.     At all times relevant hereto, Plaintiffs and subclass members'   purchases of Defendants' patent protection and invention promotion services constituted a  "transaction"  as that term is defined in Civ. Code § 1761(e).

207.     The CLRA provides in relevant part that "[t]he following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:   (1) Passing off goods or services as those of another; (2) Misrepresenting the source, sponsorship, approval, or certification of goods or services; (3) Misrepresenting the affiliation, connection, or association with, or certification by, another... (5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have... (9) Advertising goods or services with intent not to sell them as advertised... (19) Inserting an unconscionable provision in the contract.

208.     Defendant violated Civ. Code § 1770(a) subsection (1), (2), (3), (5), (9), and (19)

by representing that it would perform patent protection and invention promotion services when it had no intention of performing and no ability to perform such services and by failing to disclose information about its business under federal law.  Further, it violated §  1770(a) by stating it exhibited at trade shows on behalf of clients and representing that they are is associated with recognized trade shows when in reality WPM did not exhibit at the trade shows.  Moreover, making up false "success stories" of WPM clients making millions of dollars on its website to lure customers into believing that they too can make millions if they hire WPM violated §  1770(a). And various provisions of the contracts at issue such as the section 3 of the PPPC stating that it had made the proper disclosures under the American Invention Protection Act are unconscionable and thus violated §  1770(a).

209.    The misrepresentations and the information Defendants concealed and/or did not disclose to Plaintiff and Subclass members is  material in that reasonable consumers expect marketing material to be truthful and that when they agreed to pay Defendants thousands of dollars, Defendants actually intended and had the ability to perform the services they promised.

210.    Plaintiff and the subclass members would have behaved differently had they known the truth.  Indeed, any reasonable consumer would not have agreed to pay Defendants at all.

211.    Plaintiff and Class members justifiably acted or relied to their detriment upon the concealment and/or non-disclosure of material facts as evidenced by their purchases of the patent protection and invention promotion services from Defendants.  Had Defendants disclosed the material fact that they had no intention or ability to perform the services promised, Plaintiff and Subclass members would have behaved differently by purchasing the services from Defendants.

212.    Civil Code § 1780 (a)(2) permits any court of competent jurisdiction to enjoin

practices that violate Civil Code § 1770.

213.    Civil code § 1780(a) subsections (1) and (2) permit a court of competent jurisdiction to award damages and restitution.

214.    Pursuant to Civil Code § 1782(a), Plaintiff Jones sent Defendants notice of the particular alleged violations of Civil Code § 1770.  A copy of CRLA demand letter is attached hereto as **Exhibit N**.  More than thirty (30) days have elapsed since Defendants' receipt of Plaintiff's notice.  Defendant did not respond to Plaintiff's notice nor comply with the elements of Civil Code § 1782(c)(l)-(4).

215.    As a result of Defendants' violations of the CLRA, Plaintiff requests that the Court enjoin Defendants' unfair and deceptive conduct, and award Plaintiff and the Subclass restitution and/or damages, as well as costs and attorneys' fees.

### EIGHTH COUNT (On Behalf of Plaintiffs, Class and Subclass Members) (Fraud)

216.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

217.    Plaintiffs bring this cause of action on behalf of themselves and members of the Class and Subclass against Defendant.

218.    The misrepresentations, nondisclosure, and/or concealment of material facts made by Defendants to Plaintiffs and the members of the Class and Subclass, as set forth above, were known, or through reasonable care should have been known, by Defendants to be false and material and were intended to mislead Plaintiffs and the members of the Class and Subclass.

219.    Plaintiffs and the Class and Subclass were actually misled and deceived and were induced by Defendants to purchase services which they would not otherwise have purchased.

220.    Defendants' misrepresentations, concealments and omissions concerning the

invention promotion services were material in Plaintiffs' and other Class and Subclass Members' decisions to purchase the invention promotion services. In fact, the representations and omissions described in this Complaint, including but not limited to, the promised marketing services in the Patent Protection and Publicity Commitment, the "success stories" on Defendants' website and the failure to provide the AIPA required disclosures, to the Class and Subclass Members were so fundamental to Plaintiffs' and Class and Subclass Members' decision making process that they would not have otherwise purchased the services.

221.   Plaintiffs and the Class and Subclass suffered the damages described in this complaint as a proximate result thereof.

222.   As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs and Class and Subclass Members have suffered damages, for which they are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

### NINTH COUNT (On Behalf of Plaintiffs, Class and Subclass Members)<br>(Negligent Misrepresentation)

223.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

224.   Defendants made representations regarding their invention promotion services to Plaintiffs and members of the Class and Subclass that were not true. Defendants' statements were material, false, deceptive, and misleading and omitted material facts necessary to make the statements not misleading; such material misrepresentations and omissions were the result of Defendants' negligence.

225.   Defendants owed a duty to Plaintiffs and members of the Class and Subclass to exercise reasonable care in making representations about their invention promotion services.

226.   Plaintiffs and the Class and Subclass Members relied (or should be presumed to

have relied) on Defendants' material representations and omissions in purchasing the invention promotion services from Defendants. As a result of their justifiable reliance, Plaintiffs and members of the Class and Subclass were induced to and did purchase the invention promotion services. Plaintiffs' reliance and the Class and Subclass Members' reliance were reasonably foreseeable by Defendants (and in fact, that is why the Defendants made the misrepresentations that they did).

227. As a direct and proximate result of the negligent misrepresentations made by Defendants, Plaintiffs and the Class and Subclass Members have been damaged.

### TENTH COUNT (On Behalf of Plaintiffs, Class and Subclass Members) (Breach of Contract)

228. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

229. In exchange for paying the prices of the "Global Invention Royalty Analysis" and the "Patent Protection and Publicity Commitment", both of which are binding contracts, Plaintiff and Class and Subclass members were entitled to receive the full benefit of their contractual bargains. Those bargains included honest, objective and good faith information so that Plaintiffs and Class and Subclass Members could make informed future decisions and acquire a patent for their inventions and invention promotion services from Defendants.

230. Plaintiffs and Class and Subclass members paid Defendants thousands of dollars for patent protection services and invention promotion services. For instance, Plaintiff Harris paid $1,295.00 for the "Global Invention Royalty Analysis" and another $17,895.00 for the services described in the "10 Point Patent Protection and Publicity Commitment." Likewise, Plaintiff Carlson paid $1,295.00 for the "Global Invention Royalty Analysis" and another $34,995.00 for the services described in the "10 Point Patent Protection and Publicity Commitment." And

42

similarly Plaintiff Jones paid $1,295.00 for the "Global Invention Royalty Analysis" and another $18,895.00 for the services described in the "10 Point Patent Protection and Publicity Commitment."

231.   Defendants breached the "Global Invention Royalty Analysis" contract by providing false and misleading information to Plaintiffs and Class Members in each of their Analyses.

232.   Defendants breached the "Patent Protection and Publicity Commitment" by abandoning the patent protection process for Plaintiffs' and Class Members' inventions and then the invention promotion services Defendants promised.

233.   Plaintiffs and Class Members are entitled to damages in an amount sufficient to compensate them for the loss of the benefit of their contractual bargains with Defendants.

234.   By reason of the foregoing, Defendants are liable to Plaintiffs and Class individually, jointly, severally, or in the alternative by the Court, for actual damages sustained and consequential damages, together with punitive damages, attorneys' fees, costs of suit and interest.

### ELEVENTH COUNT (On Behalf of Plaintiffs, Class and Subclass Members)
### (Unjust Enrichment)

235.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

236.   Defendants have been unjustly enriched and received an economic benefit by the sale of invention promotion services herein to Plaintiffs and the Class and Subclass Members.

237.   Plaintiffs seek to recover for Defendants' unjust enrichment.

238.   Plaintiffs and the Class and Subclass Members conferred a benefit on Defendants, but Defendants failed to disclose their knowledge that Plaintiffs did not receive what they paid for and misled Plaintiffs and the Class and Subclass Members regarding the misrepresentations

and omissions related to their invention promotion services while profiting from this deception as described in this Complaint.

239.     The circumstances are such that it would be inequitable, unconscionable, and unjust to permit Defendants to retain the benefit of these profits that they have unfairly obtained from Plaintiffs and the Class and Subclass Members.

240.     Plaintiffs and the Class and Subclass Members, having been injured by Defendants' conduct, are entitled to restitution or disgorgement of profits as a result of the unjust enrichment of Defendants to their detriment.

**TWELFTH COUNT (On Behalf of Plaintiffs, Class and Subclass Members)**
**(Breach of the Duty of Good Faith and Fair Dealing)**

241.     Plaintiffs repeat and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

242.     Every contract contains an implied covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

243.     The "Global Invention Royalty Analysis" and the "Patent Protection and Publicity Commitment" entered into between Defendants and Plaintiffs and Class Members constituted underlying contracts by and between each Plaintiff and Class and Subclass Member and Defendants.

244.     The aforementioned contracts contained implied covenants and duties of good faith and fair dealing that the parties were required to comply with.

245.     WPM breached the above covenants and duties by providing Plaintiffs and Class and Subclass Members with false, misleading and fraudulent information that proximately caused them to continue paying Defendants monies despite the fact that Defendants knew that the

44

information it provided was false, misleading and fraudulent.

246.    Defendants' breaches of the implied covenants and duties of good faith and fair dealing proximately caused Plaintiffs and Class and Subclass Members damages.

247.    Defendants acted in bad faith and/or with a malicious motive to deny Plaintiffs and Class and Subclass Members some benefit of the bargain originally intended by the parties, thereby causing them injuries in an amount to be determined at trial.

## VII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and the Class and Subclass Members, pray for judgment against Defendants granting the following relief:

1.   An order certifying this case as a class action and appointing Plaintiffs to represent the Class and Subclass Members and Plaintiffs' counsel as Class counsel;

2.   All recoverable compensatory and other damages sustained by Plaintiffs and the Class and Subclass Members;

3.   Restitution and disgorgement of all amounts obtained by Defendants as a result of their misconduct, together with interest thereon from the date of payment, to the victims of such violations;

4.   Actual, treble, and/or statutory damages for injuries suffered by Plaintiffs and the Class and Subclass Members in the maximum amount permitted by applicable law;

5.   Statutory pre-judgment and post-judgment interest on the Class and Subclass damages;

6.   Payment of reasonable attorneys' fees and costs as may be allowable under applicable law; and

7.   Such other relief as the Court may deem just and proper.

## VIII.   <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury on all causes of action so triable.

DATED:  February 1, 2017

**POULOS LOPICCOLO PC**

By:  */s/ Joseph LoPiccolo*
      Joseph LoPiccolo
      John N. Poulos

112 W. 34th Street, 18th Floor
New York, NY 10120
212-946-2751
lopiccolo@pllawfirm.com
poulos@pllawfirm.com

Diane E. Sammons
Bruce H. Nagel (*Pro Hac Vice* Admission to be sought)
Randee Matloff (*Pro Hac Vice* Admission to be sought)
**NAGEL RICE, LLP**
103 Eisenhower Parkway
Roseland, New Jersey 07068
973-618-0400
rmatloff@nagelrice.com
bnagel@nagelrice.com

47
